UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| PHOENIA L. RAY, *fka* SPEARMAN, on behalf of A.K.D.[1], | CASE NO. 3:13CV1684 |
| Plaintiff, | JUDGE JAMES G. CARR |
| | Magistrate Judge George J. Limbert |
| v. | |
| CAROLYN W. COLVIN[2], COMMISSIONER OF OF SOCIAL SECURITY, | **REPORT & RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. | |

Phoenia L. Ray ("Plaintiff"), acting on behalf of A.K.D., a minor ("Claimant") and Plaintiff's son, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Claimant's Supplemental Security Income ("SSI") claim. ECF Dkt. #1. Plaintiff asserts that the ALJ improperly weighed the medical evidence, erred in discrediting Claimant's testimony, and substituted her own opinion for that of Claimant's treating physicians. For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for a more thorough Step Three analysis, as well as a more thorough analysis of Plaintiff's credibility.:

**I.    PROCEDURAL HISTORY**

On March 4, 2010, Plaintiff, acting on behalf of Claimant, filed an application for children's SSI, alleging disability beginning November 27, 1997 (Claimant's date of birth) due to bilateral flat feet. ECF Dkt. #15 ("Tr.") at 121. The application was denied initially and on reconsideration. *Id.* at 57-74.

---

[1]*See* L.R. 8.1(a)(2).

[2]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Plaintiff filed a request for a hearing by an ALJ and on November 10, 2011, an ALJ conducted an administrative hearing *via* video conference, where Plaintiff and Claimant appeared *pro se*. Tr. at 39-56  At the hearing, the ALJ accepted testimony from Claimant and Plaintiff.  *Id*. On March 4, 2012, the ALJ issued a Notice of Decision - Unfavorable.  *Id.* at 18-31.  Plaintiff requested review of the ALJ's decision to the Appeals Council, but on May 10, 2012, the Appeals Council denied Plaintiff's request for review.  *Id*. at 1-2.

On August 2, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  On January 10, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #18.  On February 10, 2013, Defendant filed a brief on the merits.  ECF Dkt. #19.  Plaintiff filed a reply brief on March 26, 2013 with leave of Court.  ECF Dkt. #21.

## II.  RELEVANT MEDICAL/SCHOOL HISTORY

### A.  Hearing testimony

Claimant was in the eighth grade at the time of the administrative hearing. Tr. at 46. According to the Claimant, his grades in school were "pretty good," he did his homework, his favorite subject was science, and he liked to play board games with his family. Tr. at 46-47. Claimant testified that he got along with the other students at his school and had friends, but was not involved in extracurricular activities, clubs, or organizations. Tr. at 48. Claimant indicated he was "pretty good" at video games. Tr. at 48. Claimant had no problems dressing or feeding himself, using silverware, buttoning, using zippers, and taking care of his personal hygiene. Tr. 48-59.

Claimant testified that he could not run or ride a bike. Claimant indicated he would have to "rest a couple of times" if he had to walk a block. Tr. at 49. Claimant wore braces for his feet at all times, except to sleep.  Tr. at  49-50.

Claimant testified that he had pain on the top and bottom of his feet on a daily basis. Claimant typically experienced three to four "good" days a week, and he rated his pain as a five on a scale of one to ten on the good days. Tr. at 50.  On a "bad" day, Claimant rated his pain as a seven on a scale of one to ten.  On bad days, pain prevents Claimant from "walk[ing] a distance."  Tr. at 51.  Claimant takes medication for his pain, and the medication does not cause any side effects.

-2-

Plaintiff also testified at the hearing. Tr. at 52. She stated that Claimant's progress in school was "shaky." Tr. at 52. Plaintiff indicated that Claimant gets his homework done, but she must constantly remind him to do it . Tr. at 52. According to Plaintiff, Claimant started to "act out" following his foot surgery when he realized he was still physically limited. Tr. at 53. Plaintiff testified that she must "stay on him" to maintain his personal hygiene. Tr. at 54.

Plaintiff further testified that Claimant will have to undergo the surgery a second time because the surgeon "didn't put the proper paraphernalia in his foot," and because he has grown taller since the original surgery. Tr. at 54. The ALJ found no support for this assertion in the treatment records. Plaintiff also explained that Claimant must wear expensive shoes. Tr. at 54.

### B. Medical evidence

On November 11, 2009, Claimant, who was eleven years old, saw Martha Anderson, D.P.M. complaining of painful flat feet. Tr. at 261. Claimant stated that he was unable to walk long distances without significant pain. On examination, Claimant had gastrocnemius equinus (tightening of the gastrocnemius muscle) bilaterally. Claimant exhibited pain with palpation of bilateral sinus tarsi (depression found on the lateral side of the tarsus), but his subtalar joint range of motion was full and pain free. Claimant has significant forefoot varus deformity bilaterally. Dr. Anderson diagnosed congenital pes planovalgus (flat feet) bilaterally.

Dr. Anderson ordered x-rays of Claimant's feet and ankles, and gave him a prescription for custom functional orthotics. On November 13, 2009, Claimant had x-rays of his right and left ankles and feet, which showed high grade pes planus deformity (flat feet). Tr. at 265-268. On November 18, 2009, Claimant was fitted for custom orthotics. Tr. at 256.

On December 22, 2009, Claimant told Dr. Anderson that his custom orthotic devices were very comfortable, but he was having some occasional, infrequent knee pain. Tr. at 263. Claimant had also purchased new shoes and indicated that he was feeling much better and had no ankle or foot symptoms. Dr. Anderson ordered Claimant to continue to wear his orthotic devices and to return on a yearly basis or when his feet grew by one full size or more.

Claimant continued to see Dr. Anderson regularly through 2010. On January 11, 2010, Claimant indicated he liked his orthotic devices and was pleased with how his feet looked. Tr. at

256. On January 27, 2010, Claimant reported no pain and no problems. However, on March 2, 2010, Claimant informed Dr. Anderson that he still had pain in his feet, but the orthotics had reduced his pain. Tr. at 264. Claimant was still not able to run or walk any distance. On examination, Claimant had significant pes planovalgus deformity bilaterally, but it was flexible. Claimant had no pain with palpation of the posterior tibial tendon. Dr. Anderson concluded Claimant would need surgical correction of his flat feet. In a "to Whom It May Concern" letter, dated March 30, 2010, Dr. Anderson observed that Claimant would have to miss two weeks of school, and he would be "non-weightbearing" for six to eight weeks. Tr. at 270.

On April 6, 2010, Dr. Anderson performed a bilateral gastrocnemius recession, bilateral subtalar arthroereisis and bilateral Cotton osteotomy on Claimant (surgery to correct flat feet). Tr. at 286. One week post-surgery, Claimant was doing well and tolerating the pain. Tr. at 297. On examination, all of Claimant's incisions were well coated and there were no signs of infection. Claimant's edema (swelling) was mild and not pitting. Claimant had a negative Hoffman's sign bilaterally and he was neurovascularly intact. Dr. Anderson applied bilateral below-the-knee casts and ordered Claimant to remain non-weightbearing. Dr. Anderson also ordered Claimant to remain out of school for another five weeks, because the school could not accommodate his restrictions.

On May 5, 2010, Claimant was four weeks post-surgery and was doing well. Tr. at 298. On examination, Claimant's incisions were well coated with no signs of infection and his edema was mild and non-pitting. X-rays were taken and they showed that the surgical hardware was intact. Dr. Andersen noted that the osteotomies were healing as expected and Claimant's alignment was much improved.

On June 17, 2010, Claimant underwent a psychological evaluation with Mark Hammerly, Ph.D., at R. Duke Inc. Tr. at 299-306. Claimant was referred by the Bureau of Disability Determination. Dr. Hammerly concluded that Claimant suffered from major depression, single episode, moderate. Tr. at 306. He noted that Claimant could not rise from his wheelchair. Tr. at 300.

On August 17, 2010, Claimant saw Maggie Smith, D.P.M., at the Toledo Clinic and complained of pain in his feet. Tr. at 310. At this time, Claimant was in physical therapy and was

wearing orthotics. On examination, Claimant had no edema and no pain with direct palpation. Dr. Smith noted that Claimant had an arch and no equinus. Dr. Smith concluded that Claimant would need one to two years of recovery from the surgical procedure.

On August 31, 2010, Claimant began seeing Andrew B. Clark, D.P.M. Tr. at 315-316. Plaintiff informed Dr. Clark that she was concerned because Claimant was still unable to run and had difficulties with normal ambulation. Tr. at 315. Claimant stated he had significant discomfort at times, and experienced pain in his heels. Tr. at 315. On examination, Claimant no longer had any equinus deformity, which Dr. Clark concluded was well-addressed by the surgery. Claimant still pronated significantly. X-rays were taken, which revealed no shift or change in the placement of the plates or screws from the cotton osteotomies. Dr. Clark concluded Claimant had some difficulty with ambulation and normal activities and suggested that Claimant give himself more time to heal from the surgery. Dr. Clark explained that a full recovery from his surgery could take years. Dr. Clark also suggested trying different types of support to help control the pronation and to help Claimant function more effectively. Dr. Clark prescribed articulated ankle foot orthotics ("AFOs").

On September 21, 2010, Claimant returned to Dr. Clark. Tr. at 316. Claimant had impressions taken for articulated AFOs. Claimant continued to have tenderness along the growth plate on the heels. Dr. Clark recommended Claimant take Aleve twice daily, and continue with icing, general stretching, and physical therapy. An October 14, 2010 physical therapy status report indicates Claimant assessed a 50-60% overall improvement, and scored his pain level at a two to four on a scale of one to ten. Tr. at 317. Claimant was ambulating without devices, and could walk on his heels and the balls of his feet, but he could not jump or run. Tr. at 317.

On December 9, 2010, Dr. Clark concluded that Claimant was doing "pretty well" with the AFOs, although he still had some discomfort. Tr. at 330. The top hinge of Claimant's brace was putting some pressure on his medial malleoli. Dr. Clark urged Claimant to have the orthotist modify the brace to relieve the pressure.

On May 24, 2011, Dr. Clark noted that Claimant was doing well with the AFOs. Tr. at 330. Claimant's braces had been modified so that the irritation over the medial malleoli was eliminated. However, Claimant was embarrassed to wear his AFOs during the summer with shorts, so he

requested something more discreet that he could wear inside his shoes. Dr. Clark fitted Claimant with custom orthotics. However, after Claimant began wearing the custom orthotics, he began experiencing pain. Thus, on July 14, 2011, Dr. Clark recommended Claimant wear his AFOs, at least, "for awhile." Tr. at 331. Plaintiff was prescribed Ibuprofen 600 mg. for his pain. Dr. Clark referred Claimant to an orthopedic surgeon to address his ongoing knee pain.

### C. Teacher questionnaires

On April 26, 2010, Claimant's teachers, Julie Rusgo and Joan Klein, completed a "Teacher Questionnaire" Tr. at 165-74. They indicated that Claimant had scored in the "Advanced" range on his Reading Level Achievement Test, and in the "Proficient" range on his Math Level Achievement Test. Tr. at 165. These teachers further indicated that Claimant had no educational disabilities and was placed in the regular education classroom. The teachers stated that Claimant had no problems in the following domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; and (5) caring for himself. Tr. at 167-171. The teachers described Claimant as a "bright young man" with "many friends." Tr. at 174. They further stated he was "social and expressive." Tr. at 174. However, both teachers conceded that they knew little about Claimant's foot condition.

On December 19, 2011, Joe Deangelo, Claimant's math teacher, completed a "Teacher Questionnaire." Tr. at 226-233. Mr. Deangelo indicated that Claimant did not have an unusual degree of absenteeism. Tr. at 226. According to Mr. Deangelo, Claimant had no problems comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, recalling and applying previously learned material, and applying problem-solving skills in class discussions. Tr. at 227. Mr. Deangelo indicated Claimant had a slight problem comprehending and doing math problems. Mr. Deangelo concluded Claimant had no problems acquiring and using information, attending and completing tasks, interacting and relating with others, moving and manipulating objects, and caring for himself. Tr. at 227-231.

On December 16, 2011, Kimberly Abbott completed a "Request for Administrative Information" on behalf of Deveaux Middle School. Tr. at 234-35. She stated that Claimant did well in school academically and indicated that his attendance and discipline were "very good." Tr. at 235.

### III. STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906. An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing");

20 C.F.R. § 416.924(a)-(d). In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d)(emphasis added). In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. 20 C.F.R. § 416.926(a) (emphasis added). In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a)(emphasis added). The Commissioner assesses all relevant factors, including:

> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and
>
> (3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)- (3). Further, in considering whether a child's impairment functionally equals the Listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;
>
> (iii) interacting and relating with others;
>
> (iv) moving about and manipulating objects;
>
> (v) caring for yourself; and,
>
> (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e). "Marked" limitation means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. See § 416.926a(e)(2)(i). "Extreme" limitation is the rating for the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean. See 20 C.F.R § 416.926a(e) (3)(I).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20

-8-

C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

## IV.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## V.     RELEVANT PORTIONS OF THE ALJ'S DECISION

In the instant case, the ALJ found that Claimant was a school-age child at the time of the filing of the application, was not engaged in substantial gainful activity, and he had the severe impairment of bilateral flat feet status post reconstructive surgery. Tr. at 21. The ALJ further found that Claimant's severe impairments, individually or in combination with other impairments, did not meet or medically equal any of those in the Listings. Tr. at 22. The ALJ stated that she had considered Listing 101.03 in reaching her conclusion. *Id*. She then determined that Claimant's impairments, individually or in combination, did not meet or functionally equal the Listings. *Id*. at 22-30. Based upon her findings, the ALJ concluded that Claimant was not disabled and therefore not entitled to childhood SSI. *Id.* at 30.

The ALJ acknowledged that Claimant's recovery from surgery may take as long as two years. Tr. at 25. The ALJ further noted that Claimant was excused from physical education classes as of August 25, 2011, and, according to treatment notes dated August 17, 2010, Claimant was permitted an extra five minutes to move between classes. Finally, the ALJ noted that Claimant would likely require braces until he stopped growing or a physician deemed otherwise.

In concluding that Claimant had a less than marked limitation in moving about and manipulating objects[3], the ALJ wrote, "[Claimant] testified that he is unable to ride a bike, run or walk long distances, but he indicated that he is "pretty good" in playing videogames." Tr. 28. The ALJ concluded that Claimant may not have been wearing his orthotics as recommended due to statements from his teachers, but, the ALJ nonetheless concluded that "[Claimant] is able to move about in school adequately, and the record as a whole fails to establish marked limitation in this domain." Tr. at 29.

The ALJ also concluded that Claimant has a less than marked limitation with respect to his health and physical well-being. Tr. at 30. The ALJ noted that Claimant takes over-the-counter pain medication, and that the recovery time for the reconstructive surgery performed is typically long. The ALJ also noted that Claimant has "benefitted from orthotics and AFOs, and, as of his most recent visit with [Robert A. Seale, CO, LO, at Swanson Orthopedic & Prosthetic Center], no problems were present." Tr. at 30.

## **VI.   ANALYSIS**

Although Plaintiff divided her argument into three parts, Plaintiff actually relies on each of the arguments working in conjunction to challenge the ALJ's decision at Step Three. The ALJ provided the following analysis of the Listing at Step Three:

---

[3]The ALJ acknowledged that "Social Security rules provide that an adolescent should be able to use his motor skills to move freely and easily at home, at school, and in the community. The child should be able to participate in *a full range of individual and group physical activities*." Tr. at 28 (emphasis added).

-10-

> [Claimant's foot impairment does not meet the criteria of Listing 101.03 (Reconstructive surgery or surgical arthodesis of a major weight-bearing joint) as the evidence fails to establish that [Claimant] is unable to ambulate effectively, as defined in section 1001.00B2b. [Claimant] does not require a cane, and although A. Clark, D.P.M., advised that [Claimant] could not participate in gym class on August 25, 2011, the evidence is insufficient to establish that [Claimant] is otherwise significantly limited in terms of performing age-appropriate activities due to foot impairment. It is noteworthy that teacher J.DeAngelo opined that [Claimant] had no limitation in moving about in December 2011. He noted a question mark by "Orthopedic devices" in the area of health and physical well-being, and he recorded, "May have mother says he does." This suggests that [Claimant] was not wearing his braces to school. In any event, Mr. DeAngelo's responses support that [Claimant] functions normally at school. The criteria of Listing 101.03 are not met.

Tr. at 22.

Plaintiff first contends that the ALJ gave great weight to the opinions of Claimant's teachers regarding his ability to function, even when those opinions were at odds with the opinions of Claimant's treating physicians, in violation of the treating physician's rule. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof),

specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.  *Id.* citing §404.1527(c)(6).

Finally, evidence from "other sources" may not be used to establish the existence of a medically determinable impairment or given controlling weight, however, the ALJ may use evidence from "other sources" to demonstrate the severity of the claimant's impairments and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d)(1); *Cruse v. Comm'r*, 502 F.3d 532, 541 (6th Cir.2007).  "Other sources" include nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists.  *Id.*   When considering opinions from non-medical sources who have seen a plaintiff in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 820 (N.D.Ohio 2009) (citing *Cruse, supra*, at 541.)

Here, the ALJ credited the observations of Claimant's teachers regarding his ability to function at school, which did, in fact, contradict the physicians' opinions regarding Claimant's ability to participate in gym and to move between classes at a normal pace. While the teachers' opinions regarding Claimant's scholastic abilities would certainly be afforded weight, their opinions regarding his physical abilities should not have been credited over the opinions of Claimant's treating physician, unless they were supported by other substantial evidence in the record. As a consequence, the undersigned recommends that the Court find that Plaintiff's argument predicated upon the treating physician rule is well-taken.

Next, Plaintiff argues that, without the ALJ's reliance on the teacher questionnaires, the evidence shows that Claimant meets Listing 101.00B2b.  The burden of proof at Step Three of the sequential entitlement to children's social security benefits rests with Plaintiff. *Franklin ex rel. L.F. v. Comm'r of Soc. Sec.*, No. 4:10CV2215, 2012 WL 727799, at *1 (N.D. Ohio Feb. 16, 2012), citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). The ALJ must "nevertheless provide articulation of step three findings that will permit meaningful review of those findings." *Franklin*,

citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011). "As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Hernandez ex rel. L.A. v. Astrue*, No. 1:10CV1295, 2011 WL 4899960, at *6, citing *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm'r of Soc.* Sec., 378 F.3d 541, 544-546 (6th Cir. 2004).

> Listing 101.00, captioned, "Musculoskeletal System," reads, in pertinent part:
>
> A. Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes. Impairments may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events, or neoplastic, vascular, or toxic/metabolic diseases.
>
> B. Loss of function.
>
> 1. General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence. The provisions of 101.02 and 101.03 notwithstanding, inflammatory arthritis is evaluated under 114.09 (see 114.00D6). Impairments with neurological causes are to be evaluated under 111.00ff.
>
> 2. How we define loss of function in these listings.
>
> a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment.
>
> The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone. When there is an inability to perform these activities due to a mental impairment, the criteria in 112.00ff are to be used. We will determine whether a child can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the child's ability to perform the specific activities listed as examples in 101.00B2b(2) and (3) and 101.00B2c(2) and (3).
>
> b. What we mean by inability to ambulate effectively.
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning

> (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 101.05C is an exception to this general definition because the child has the use of only one upper extremity due to amputation of a hand.)
>
> . . .
>
> (3) How we assess inability to ambulate effectively for older children (emphasis added). *Older children, who would be expected to be able to walk when compared to other children the same age who do not have impairments, must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out age-appropriate activities.* They must have the ability to travel age-appropriately without extraordinary assistance to and from school or a place of employment.
>
> Therefore, examples of ineffective ambulation for older children include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, *the inability to walk a block at a reasonable pace on rough or uneven surfaces*, the inability to use standard public transportation, *the inability to carry out age-appropriate school activities independently*, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about the child's home or a short distance at school without the use of assistive devices does not, in and of itself, constitute effective ambulation.

The undersigned recommends that the Court find that the ALJ's Step Three meets or equals analysis is lacking. While the ALJ stated that she considered this Listing, the ALJ failed to discuss the Listing and failed to compare it with the evidence of record to show how she determined that Claimant's impairments did not meet or medically equal the Listing.

Furthermore, the ALJ disregarded two compelling pieces of evidence, in favor of evidence that does not support her conclusion that Claimant is not "significantly limited in terms of performing age-appropriate activities" due to his foot problems: First, the ALJ acknowledged that Claimant cannot walk long distances or run, but she then observed that he can play videogames. Second, the ALJ acknowledged that Claimant cannot participate in gym class, but she then cited testimony from a teacher that Claimant has no limitation in moving and that his orthopedic devices are not visible at school. It is important to note that Claimant was given additional time to move between classes, and he was reluctant to wear his AFOs in the summer because they would be visible when he wore shorts. Due to the ALJ's failure to give appropriate weight to the foregoing evidence in the Decision, the undersigned recommends that the Court reverse the Decision and remand the case for further analysis at Step Three.

In *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411 (6th Cir. 2011), the Sixth Circuit Court of Appeals reversed and remanded the case when the ALJ found that the claimant had severe physical and mental impairments at Step Two of the sequential analysis but failed to analyze the claimant's back impairment at Step Three despite concluding that his back impairment had failed to meet or equal a Listing. The Sixth Circuit noted that while the ALJ had thoroughly addressed the claimant's severe mental impairments in his Step Three analysis, " '[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe 'back pain' impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* at 415. The Sixth Circuit found that:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416 [citations omitted].

Courts within this District have applied *Reynolds* and vacated and remanded cases where the ALJ provided only a conclusory statement and failed to conduct a meaningful Step Three analysis that compares the medical evidence to the applicable listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing. *See e.g., Saleh v. Comm'r of Soc. Sec.,* 2013 WL 3421835, at *8 (N.D. Ohio July 8, 2013); *Waller v. Astrue,* 2012 WL 6771844 at * 2–5 (N.D.Ohio Dec.7, 2012) *adopted,* 2013 WL 57046 (N.D.Ohio Jan.3, 2013); *May v. Astrue,* 2011 WL 3490186 at * 7–10 (N.D.Ohio June 1, 2011) *adopted,* 2011 WL 3490229 (N.D.Ohio Aug.10, 2011); *Keyes v. Astrue,* 2012 WL 832576 at * 5–6 (N.D.Ohio March 12, 2012); *Hunter v. Astrue*, 2011 WL 6440762 at * 3–4 (N.D.Ohio Dec.20, 2011); *Marok v. Astrue,* 2010 WL 2294056 at * 5 (N.D.Ohio June 3, 2010); *Hakkarainen v. Astrue*, 2012 WL 398595 at * 10–13 (N.D.Ohio Jan.19, 2012) *adopted* 2012 WL 396970 (N.D.Ohio Feb.7, 2012); *Shea v. Astrue,* 2012 WL 967088 at * 8–11 (N.D.Ohio Feb.13, 2012) *adopted* 2012 WL 967072 (N.D.Ohio March 21, 2012). While no heightened articulation at Step Three is required, an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings. *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011).

Likewise, a number of cases in this Circuit hold that an ALJ's functional equivalence analysis does not suffice to substitute for the Step Three meets or equals analysis. *See M.G. v. Comm'r of Soc. Sec.,* 861 F.Supp.2d 846, 859, n.6 (E.D. Mich. 2012)(collecting cases); *Evans ex rel. DCB v. Comm'r of Soc. Sec*., No. 11-cv-11862, 2012 WL 3112415, at *9 (E.D. Mich., Mar. 21, 2012), unpublished (collecting cases). According, the undersigned recommends that the Court find that the ALJ's functional equivalence analysis in this case does not provide an adequate substitute for the Step Three meets or equals analysis.

In addition, and although Defendant does not raise the issue, an ALJ's failure to explain how she reached her Step Three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner. *See Hufstetler v. Comm'r of Soc. Sec*., No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011). However, the undersigned recommends that the Court conclude that the ALJ's failure to address compelling evidence in the record does not constitute harmless error.

Finally, Plaintiff contends that the ALJ erred in discrediting Claimant's testimony regarding his functional ability and his pain. When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40.

Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that

determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc.* 1997).

Here, the ALJ appears to have discredited Claimant's testimony regarding his inability to walk a block without stopping and his testimony regarding his pain. However, the ALJ offered no reason for discrediting Claimant's testimony.

Moreover, Plaintiff and Claimant were unrepresented at the hearing. Although Plaintiff bears the burden of establishing that he is entitled to disability benefits, courts have recognized that social security proceedings are "inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). As a result, an ALJ has an affirmative duty to develop the factual record upon which his decision rests, regardless of whether the claimant is represented by legal counsel at the administrative hearing. See *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir.1983). However, where the claimant is without counsel, incapable of presenting an effective case, and unfamiliar with hearing procedures, the ALJ has a "special, heightened duty" to develop the administrative record and ensure a fair hearing. See *Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir.2008) (citing *Lashley*, 708 F.2d at 1051-52). To satisfy this duty, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and must be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Lashley*, 708 F.2d at 1052 (internal citations omitted). As a consequence, the undersigned recommends that the Court remand this case for further analysis of Plaintiff's credibility regarding his physical limitations and his pain.

## VII. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND the instant case for further analysis and articulation of the Step Three meets

or equals analysis and the functional equivalence analysis, as well as the analysis of Plaintiff's credibility.

**IT IS SO ORDERED.**

DATE: August 18, 2014         */s/George J. Limbert*
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE